**Affirmed and Memorandum Opinion filed November 29, 2018.**



In The

# Fourteenth Court of Appeals

### NO. 14-18-00528-CV

## IN THE INTEREST OF J.A.M., S.N.M., M.A.H., CHILDREN

**On Appeal from the 314th District Court
Harris County, Texas
Trial Court Cause No. 2015-06857J**

## M E M O R A N D U M   O P I N I O N

Appellant P.D.M. (Mother) appeals the trial court's final decree terminating her parental rights and appointing the Department of Family and Protective Services as sole managing conservator of her children, J.A.M. (Jerry), S.N.M. (Sam), and M.A.H. (Melissa).[1] The trial court terminated Mother's rights on the predicate grounds of endangerment. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D) & (E) (West Supp. 2017). The trial court further found that termination of Mother's rights

---

[1] We use pseudonyms to refer to appellant, the children, and other family members. *See* Tex. Fam. Code Ann. § 109.002(d) (West 2014); Tex. R. App. P. 9.8.

was in the children's best interest, and named the Department managing conservator of the children. All three children had different fathers. Jerry's father, C.L.M., and Sam's father, O.S., executed irrevocable affidavits of relinquishment. Melissa's father's rights were terminated on grounds of endangerment and conviction for being criminally responsible for the death or serious injury of a child. The fathers have not appealed the termination of their parental rights.

In a single issue Mother challenges the factual sufficiency of the evidence to support the trial court's finding that termination is in the best interest of the children. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Pretrial Proceedings

#### 1. Removal Affidavit

The Department received a referral alleging physical abuse of a child, E.L. (Ernesto)[2], by Melissa's father, M.H. (Marco) and Mother. Ernesto, who was three years old, had a black eye, a bruise on his jaw and cheek, and the white of one of his eyes was red. Mother reported that Ernesto sustained the bruises by running into a rocking chair. Ernesto had "lateral healing bruises" on the backs of his legs, which Mother explained were the result of a spanking earlier in the week. Ernesto also had a bruise on his right arm the size of an adult's hand. Medical staff did not believe the injuries all happened during the same incident. It was alleged that Marco inflicted the physical abuse. At the time of the referral Ernesto lived with Mother and Marco, and there were two other siblings, Jerry and Sam, living in the home. Ten days after the referral, Melissa was born.

---

[2] The removal affidavit notes that Ernesto's father had custody of Ernesto and would be seeking primary managing conservatorship after the abuse was reported.

The reporter concluded that Ernesto was a vulnerable child who sustained multiple injuries and bruises on several different occasions. Mother's explanations did not "line up" with Ernesto's injuries, and Ernesto was unable to protect himself. A police investigation revealed that Marco caused the injuries and Mother tried to "cover-up for him."

Jerry, who was five years old, reported that Marco also hit him and bit his hands. Jerry was afraid of Marco. Sam, who was one year old, and Melissa, who was a newborn, were too young to disclose abuse to law enforcement. The reporter noted that Mother's primary concern was staying in a relationship with Marco, rather than protecting her children. Marco admitted causing the children's injuries and displayed no remorse. The Department determined it was unsafe for the children to return home and sought temporary managing conservatorship. After receiving medical treatment, Ernesto lived with his father. The other children were placed with relatives.

## 2.    Investigation

Ernesto told the investigator that Marco hurt him but did not want to talk about details.

Mother reported that she was trying to obtain child support from Sam's father, and that Jerry's father was in prison. Mother denied domestic violence in the home and denied drug or alcohol use. Marco was unemployed and watched the children while Mother worked. Mother admitted causing the bruising on Ernesto's bottom by spanking him. In response to the allegation that Ernesto's injuries were caused by Marco, Mother said that Ernesto is a clumsy child who had trouble focusing, that he hit his eye on a rocking chair, and she did not know how the bruising on his ear occurred.

3

Marco reported that there was no domestic violence or drug use in the home. Marco was in the room when Ernesto hit his eye on a rocking chair causing a black eye. Marco said the bruising on Ernesto's ear was caused by the "boys fighting a lot." Marco indicated he would discipline the children by taking "things away like TV and toys," making them stand in the corner or "do wall sits." Marco said that Mother "does the whooping with the belt"; Marco only uses "a belt as a last resort."

The investigating police officer later called the Department's investigator and reported that Marco initially said that Ernesto fell, but "finally admitted that he pushed [Ernesto] which made him hit his head and cause a huge gash on the head." The officer also reported that Marco said, "Oh we never hit [Ernesto] (because his dad is in the picture)." Mother reported to the officer that Marco was "fed up with the kids and that's the reason why he abused her kids."

After the children were placed with relatives, Mother gave birth to Melissa. While Mother and Melissa were still in the hospital, the relative contacted Mother and the Department and explained that she could not continue to keep the children. A maternal aunt agreed to allow Mother, Jerry, Sam, and Melissa to move in with her. The caseworker explained that Marco was not permitted to be unsupervised with any of the children. Mother continued to make excuses for Marco and denied that Marco hurt the children even after Marco admitted the abuse to police. After Jerry told the caseworker that he was afraid of Marco and that Marco was hitting and biting him, the Department limited Marco's supervised visitation to Melissa, his biological child. After the children and Mother lived with the maternal aunt for approximately two weeks, the maternal aunt told the caseworker she could no longer keep them in her home. No other viable relative placements could be established.

### 3. Family Service Plan

After the children were removed the Department was named temporary

4

managing conservator and a family service plan was created and made an order of the court. Mother was instructed that a failure to complete the services required by the plan could result in termination of her parental rights. The plan required Mother to:

- attend and participate in all court hearings, permanency conferences, scheduled visitations, and meetings requested by the Department or the courts;

- provide for her children and herself through stable, legal employment;

- acquire and maintain stable housing more than six months;

- participate in parenting classes in person;

- participate in domestic violence classes and education to assist her with recognizing how violence in her relationship negatively impacts the family;

- fully participate in a psychosocial assessment to address her mental and emotional health needs; and

- submit to random urine analysis with the instruction that a refusal to test will be considered a positive result.

The trial court also signed a "no-contact" order in which Mother was instructed not to have any contact with Marco. The consequence of continued association with Marco was suspension of visitation.

### 4.    Court-Appointed Child Advocate's Report

The Child Advocate filed a report in which she noted that Mother had not seen her children for almost two years because she continued to violate the no-contact order by allowing Marco to live with her. The report noted that Marco continued to live in the home with Mother except for brief periods of time when he was incarcerated for failure to pay child support.

The Advocate reported that Jerry arrived in his foster placement behind in his

academics as he had missed Kindergarten. Jerry experienced difficulty eating and sleeping and experienced a high level of anxiety creating behavior problems both in and out of the home. While in foster care Jerry improved both academically and behaviorally. Jerry began taking medication for Attention Deficit Hyperactivity Disorder, which, coupled with individual therapy, had improved his behavior, anxiety, and anger.

Sam arrived in foster care "quite delayed in most aspects of development." Although he was more than one year old at the time Sam could not walk or crawl and had "significant eating difficulties." Sam demonstrated self-harming behaviors when he was frustrated. The self-harm included hitting himself in the head. Sam demonstrated an inability to play as if he had never seen toys and was unable to play with other children. Sam continued to experience eating difficulties, which were described as an inability to stop eating even when full. In foster care, he experienced "significant improvement" in his processing abilities demonstrating imagination and awareness of toys and how to play with them. At three years old Sam continued to have difficulty speaking and received regular speech and occupational therapy. In almost two years of foster care, Sam progressed from an angry, self-harming child to a happy, smiling, playful child.

**B.    Trial**

The trial began November 29, 2016 but was recessed to accommodate a request "for additional time." Trial resumed January 31, 2017 with the caseworker's testimony and the admission of documentary evidence.

Trial resumed several months later on May 31, 2018. The Department introduced into evidence returns of citation on the parents, the children's birth certificates, the removal affidavit, protective order, temporary orders, the order requiring compliance with the family service plan, Mother's drug test results,

Marco's drug test results and criminal records, Ernesto's medical records, copies of text messages between Mother and Marco, and copies of the permanency plan and permanency progress report. The fathers' attorneys objected to evidence of the removal affidavit and certain drug test results because those exhibits were irrelevant to the termination allegations filed against their clients. The trial court overruled the objections and admitted all documents.

### 1. Mother

The children came into the Department's care because Ernesto's father reported Ernesto's injuries. During the investigation into Ernesto's injuries, Mother did not believe that Marco caused Ernesto's injuries. Mother subsequently provided a group of text messages, introduced into evidence, that indicated she was "covering up" for Marco. The caseworker testified that Mother has not shown she can protect the children.

Mother completed the tasks on her service plan, but the Department was concerned that Mother did not understand the consequence of not accepting responsibility for the injuries to Ernesto. The Department was concerned that despite the no-contact order Mother continued to allow Marco to live with her. Mother allowed Marco to live with her knowing that she was not allowed to visit her children while he lived with her. During this time when Marco lived with Mother he pleaded guilty to an injury to a child charge.[3] The caseworker was concerned that Mother was unable or unwilling to protect the children from Marco.

Colby Guinn, the Child Advocate's supervisor, underscored the Department's concern about Mother's failure to protect her children. Mother admitted to Guinn

---

[3] The record reflects that Marco pleaded guilty to the offense of injury to a child in exchange for six years of deferred adjudication community supervision.

7

that when Marco gave Jerry a black eye, Mother did not report the injury or seek medical attention for Jerry but treated it with ice. Guinn testified that Mother had never articulated that she understood the severity of the children's injuries. Suspecting that Mother was also a victim of domestic violence, Guinn asked Mother whether she had also been abused. Mother denied being a victim of domestic violence and reported that if Marco had hit her she would have asked him to leave the home immediately.

Mother insisted that Marco live in the home and work services with her despite being instructed by the Department and a therapist that it was necessary for Marco to leave the home. Mother thought that she and Marco could demonstrate to the Department that they could remain a family. Marco did not leave the home until he was incarcerated for failure to pay child support.[4]

Guinn testified that the risk Mother posed to the children at the time they came into care was still present at the time of trial. Although Mother was provided services and participated in them, she had not made any progress in being protective of the children. With regard to the service plan, Guinn testified:

> Everything that's in that treatment plan has already been addressed in 2016. Two years have lapsed, and, now here we are at the end, and they want to address those things again. I think they may be helpful for her down the line, but as of right now, it's so late, when they could have already been addressed or she could have taken full advantage of the services that were provided to her at that time.

Chris Hale, the Child Advocate volunteer, testified that termination was in the children's best interest because throughout the pendency of the termination case Mother chose her own wishes over her children's safety. Hale testified that a no-contact order was in place that prohibited Mother from visiting her children if she

---

[4] The child for whom Marco was ordered to pay support was not part of this proceeding.

had contact with Marco. Despite that order Mother continued to maintain a relationship with Marco rather than visit her children. Hale challenged the testimony that Mother completed all her services because she failed to provide a safe home for the children by permitting Marco to remain in the home. By May 31, 2018 when the trial concluded Mother had not seen her children for two years because she refused to comply with the no-contact order put in place by the court. Mother placed her own wishes over the safety of her children.

Mother testified that she had been working at Walmart for six years. While Mother was at work Marco took care of her children. Marco tested positive for high levels of marijuana, but Mother testified she did not know Marco was using marijuana. Mother was questioned about the graphic text message exchange between Marco and her. The text messages reflect that Marco admitted hurting Ernesto and claimed he hurt him because Mother was absent. In one text message, Marco stated:

> [Ernesto] pissed and he keeps lying saying he didn't. I have him pull his diets [sic] and underwear off and he's still saying no . . . so I open the pull up and say you see where it's wet you see that yellow that's pee . . . so Ima ask you again did you pee? He says no and almost pisses in my hand but I let go of the pull up . . . for lying 5 times and peeing on me I tore his MF ASS UP with a belt . . . he wanted to pull a [Jerry] and fall to the floor so yea he got popped in the back and face on accident . . . yea his eyes gonna look bad but IDGAF he shouldn't have lied he shouldn't have pissed on me and . . . I'm tired of when they don't listen and I hit them they move and run because their [sic] not used to being disciplined so I NOOOOOOOOO longer give a Fuck how they look . . . maybe if they fuckin listened or you had a [baby] sitter shit would change . . . I am in no mood to talk debate discuss any of this . . . I'M TIRED OF YOUR MF KIDS ALLLLREEADDDYYY.

Marco sent the above-quoted text message to Mother in September 2015 when Ernesto was three years old and Jerry was five years old. Ernesto's injuries were reported to the Department two months later on November 1, 2015. Mother

continued to deny to the Department and the police that Marco had injured her children. Mother alleges she separated from Marco in July 2016, almost one year after he admitted harming her children.

Mother admitted lying to the police and the Department about Ernesto's injuries. Mother separated from Marco when she was told of the possibility that her children would be adopted. Mother denied any physical threats from Marco. Mother admitted allowing Marco to babysit her children after he admitted hurting Ernesto and Jerry.

### 2.     The Children

The caseworker testified that the children were one, two, and six years old and were placed in foster care. The children bonded with each other. The day before trial resumed on January 31, 2017, the children were placed in an adoptive foster home. Melissa and Sam had been together through the entire case, but Jerry was not placed with them until recently.

By the time trial resumed May 31, 2018, Melissa and Sam had been moved back to their original placement, and Jerry was in a new placement with no other children in the home. Hale testified that this placement was better for Jerry due to behavioral issues Jerry displayed earlier. Hale described Jerry's earlier behaviors as being "high strung" and having "difficulty with food." Jerry was also described as being "very, very angry, which he demonstrates in poor behavior." In the new placement Jerry was cooperating and happy and had no problems in school.

When Sam came into care, at two years old, he was "extremely scared and anxious." Sam cried all the time and exhibited self-harming behavior any time he was frustrated. Sam had no speech abilities; Sam's lack of communication skills led to his frustration. Since being in foster care for two years, Sam's sense of security

10

increased significantly. Sam played and interacted with other family members.

Even in foster care both Jerry and Sam experienced problems with food. Neither of them wanted to ever stop eating. Both children had been in therapy, but there was no documentation as to possible causes of their food issues.

Melissa experienced no trauma because she was removed at birth. Melissa was happy and secure, and had bonded with Sam. Sam was able to learn from Melissa because Melissa was "growing up normally" in contrast to Sam's developmental delays.

Hale testified that all three children were safer in the two foster homes than they would be with Mother. At least once a month the children saw each other and had the chance to bond with each other. The children's grandparents were initially considered for placement, but the grandparents also denied the abuse the children were exposed to with Marco. Mother testified that she had a bond with her children, but that Sam seemed to have forgotten who she was.

When asked what Jerry's wishes were, Hale responded that Jerry said he missed his mother, but also "expressed to me that he wants to be safe and he wants to not be hurt." Jerry also expressed a reluctance to live with other children.

Leslie Mike was the Department caseworker who had been on the case for four to five months before trial. Mike testified that it was in the children's best interest to terminate Mother's rights because Mother could not be protective of her children. Contrary to Mother's testimony, Mike testified that in the four or five months before trial Mother was still in denial about whether Marco caused Ernesto's injuries. At the time of trial Jerry was experiencing tantrums and was verbalizing what happened with regard to the abuse. Jerry was afraid that Mother was still living with Marco and that Mother was being harmed by Marco.

The trial court terminated Mother's parental rights on grounds of endangerment and that termination of Mother's rights was in the children's best interest. *See* Tex. Fam. Code Ann. §§ 161.001(b)(1)(D) & (E) & 161.001(b)(2).

## II. ANALYSIS

In a single issue, Mother challenges the factual sufficiency of the evidence to support the trial court's finding that termination is in the best interest of the children.

### A. Standards of Review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

Due to the severity and permanency of terminating the parental relationship, Texas requires clear and convincing evidence to support such an order. *See* Tex. Fam. Code Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *In re J.F.C.*, 96 S.W.3d at 264.

The heightened burden of proof in termination cases results in a heightened standard of review. *In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.). In reviewing the factual sufficiency of the evidence under the

clear-and- convincing burden, we consider and weigh all of the evidence, including disputed or conflicting evidence. *In re J.O.A*., 283 S.W.3d 336, 345 (Tex. 2009). "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. We give due deference to the fact finder's findings and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

In a proceeding to terminate the parent-child relationship brought under section 161.001 of the Texas Family Code, the petitioner must establish, by clear and convincing evidence, one or more acts or omissions enumerated under subsection (1) of section 161.001(b) and that termination is in the best interest of the child under subsection (2). Tex. Fam. Code § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

## A. Predicate Termination Grounds

The trial court found by clear and convincing evidence that it was in the children's best interest to terminate Mother's parental rights under section 161.001(b)(1)(D) and (E). In her brief Mother concedes the evidence is legally and factually sufficient to support the trial court's finding of the predicate ground under section 161.001(b)(1)(D) of the Texas Family Code. Mother does not challenge the trial court's findings on the predicate ground under section 161.001(b)(1)(E).

The trial court could consider the evidence that supported the endangerment grounds for termination as support for its best interest determination. *See In re S.R.*, 452 S.W.3d 351, 366 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("evidence supporting termination under one of the grounds listed in section 161.001(1) also can be considered in support of a finding that termination is in the

13

best interest of the children.”).

## C.    Best Interest of the Children

In her sole issue Mother challenges the factual sufficiency of the evidence to support the trial court's finding that termination is in the best interest of the children.

The factors the trier of fact may use to determine the best interest of the child include: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parents' acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *see also* Tex. Fam. Code Ann. § 263.307(b) (listing factors to consider in evaluating parents' willingness and ability to provide the child with a safe environment).

Courts apply a strong presumption that the best interest of the children is served by keeping the children with their natural parents, and the burden is on the Department to rebut that presumption. *In re D.R.A.*, 374 S.W.3d at 531. Prompt and permanent placement in a safe environment also is presumed to be in the children's best interest. Tex. Fam. Code Ann. § 263.307(a). A finding in support of "best interest" does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371–72.

14

### 1. *Desires of the children*

At the time of removal Jerry was five, Sam was one, and Melissa was a newborn. The children spent two years in foster care while the parental termination case was pending. When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster parent, are well cared for by the foster parent, and have spent minimal time with a parent. *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

Mother argues that the record supports Jerry's desire to remain with her. Caseworker Mike testified that Jerry told her he missed his mother. She also testified that Jerry told her he did not want to be hurt, and that Jerry demonstrated behavior indicating trauma caused by Marco's abuse. Jerry also told Mike he was afraid to live with Mother because he thought Mother was still living with Marco.

Mother further argues that the trial court prevented her from bonding with her children by keeping the no-contact order in place until the time of trial. Mother argues that she separated from Marco several months before trial but was still not allowed to visit her children. The record reflects Mother did not separate from Marco until Marco was incarcerated on an unrelated child-support order. Despite Mother's claim that she had separated, Mike testified that in the four or five months before trial there were indications that Mother was still in contact with Marco. The evidence shows that over a two-year period while Mother's children were in the Department's care, Mother chose to live with her children's abuser rather than visit her children. When asked by the caseworker and the Child Advocate, Mother denied being a victim of abuse and stated that she would not live with Marco if he abused her. Mother, however, faced with Marco's admission that he abused her children, chose to continue to associate with Marco.

As to the foster home, the record reflects that Melissa, who was removed as a

newborn, did not experience trauma and was happy and secure with the foster parents. Jerry and Sam continued to experience issues with food even when in foster care but were receiving therapy to address their issues. Sam, who came into care "extremely scared and anxious" exhibiting self-harming behavior, developed an increasing sense of security and played and interacted with other family members.

Jerry, the oldest child, experienced physical abuse and was exposed to trauma for a longer period of time than the other children. Jerry was unable to live in a home with other children, and, when he came into care was "very, very angry." Since living in a foster home where he was the only child Jerry was cooperating, happy, and had no problems in school. This factor weighs in favor of termination.

2. *Present and future physical and emotional needs of the children and present and future physical and emotional danger to them*

Regarding this factor, we note that the need for permanence is a paramount consideration for the children's present and future physical and emotional needs. *See In re D.R.A.*, 374 S.W.3d at 533.

While some children may have extraordinary physical and emotional needs requiring extra care, all children have physical and emotional needs that must be met every day. The record reflects that Jerry and Sam have greater emotional needs than the average child. With regard to their emotional and physical needs, evidence showed that Mother did not provide for their past or present physical and emotional needs.

Marco was a danger to the children at the time they came into care and Mother was unable to protect them. Mother argues that by the time of trial she no longer posed a danger to the children's physical and emotional needs. A fact finder may infer from a parent's past inability to meet the children's physical and emotional needs an inability or unwillingness to meet the children's needs in the future. *See In*

16

*re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

Mother argues that her separation from Marco and completion of the services on her family service plan indicate she is no longer a danger to her children. Although Mother claims to have no contact with Marco, other evidence contradicts Mother's statements. A reasonable fact finder could credit Mother's completion of tasks on the service plan and decide it justified the risk of preserving the parent-child relationship, but we cannot say the trial court acted unreasonably in finding the children's best interest lay elsewhere. *See In re M.G.D.*, 108 S.W.3d 508, 514 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). It is not our role to reweigh the evidence on appeal, and we may not substitute our judgment of the children's best interest for the considered judgment of the fact finder. *Id.* This factor weighs in favor of termination.

4. *Parental abilities of those seeking custody, stability of the home or proposed placement, and plans for the children by the individuals or agency seeking custody*

These factors compare the Department's plans and proposed placement of the children with the plans and home of the parent seeking to avoid termination of the parent-child relationship. *See In re D.R.A.*, 374 S.W.3d at 535.

Mother failed to protect her children from a known abuser. Mother claims that she separated from the abuser before trial. While this court may consider a parent's "recent turnaround" as a factor in the best-interest analysis, this factor is not determinative in a sufficiency review. *See In re J.O.A.*, 283 S.W.3d at 346 (noting that evidence of improved conduct, especially of short duration, does not conclusively negate the probative value of a long history of irresponsible choices). Although the record reflects that Mother completed the tasks in her service plan, it also demonstrates that she continued to make choices in her relationship with Marco

17

that endangered the children.

As to the evidence of the proposed placement, there was testimony that the homes the children were in were adoptive foster homes. The evidence on the proposed adoption was not well developed. Evidence about placement plans and adoption are relevant to best interest. *In re C.H.*, 89 S.W.3d at 28. However, the lack of evidence about definitive plans for permanent placement and adoption cannot be the dispositive factor; otherwise, determinations regarding best interest regularly would be subject to reversal on the sole ground that an adoptive family has yet to be identified. *Id*. Instead, the inquiry is whether, on the entire record, a fact finder reasonably could form a firm conviction or belief that termination of the parent's rights would be in the children's best interest. *Id*.

Accordingly, the Department's lack of evidence of a definitive adoption plan for the children at the time of trial does not render the evidence insufficient to support the trial court's finding that termination of Mother's parental rights is in the children's best interest. The Department and the foster parents are working to assist the children in overcoming the behaviors developed during their formative early years in the endangering environment in Mother's home. Although there was little evidence of a plan at the time of trial, the trial court could have determined that keeping the children with the foster parents with an eye toward adoption was in the children's best interest as opposed to placing the children with Mother. This factor weighs in favor of termination.

5.    *Programs available to assist in promoting the children's best interest*

Mother argues that although her parental abilities were lacking when the Department became involved with the family, by the end of the case she had demonstrated significant improvement in those abilities. Mother cites her completion of the service plan tasks and counseling as evidence of her turnaround.

To be sure, Mother completed the services required by her family service plan. There was some evidence that Mother did not complete the entire plan because she did not provide the children with a safe home environment, choosing to live with their abuser. "Compliance with a family service plan does not render termination impossible or trump all other termination factors." *In re A.F.*, No. 14-17-00394-CV, 2017 WL 4697836, at *10 (Tex. App.—Houston [14th Dist.] Oct. 19, 2017, no pet.) (mem. op.). "The elements of a safe, stable, and happy childhood cannot all be reduced to a checklist in a service plan." *In re M.G.D.*, 108 S.W.3d at 514. In light of Mother's refusal to separate from her children's abuser, the trial court could have held a firm conviction that, despite Mother's compliance with the family service plan, her endangering conduct was likely to continue.

Viewing all the evidence equally for our factual-sufficiency analysis, we conclude that a reasonable fact finder could have formed a firm belief or conviction that termination of Mother's rights was in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2). We overrule Mother's sole issue.

## III. CONCLUSION

Having concluded that the evidence is factually sufficient to support the finding that termination of Mother's parental rights is in the best interest of the children, we affirm the judgment terminating Mother's parental rights and naming the Department managing conservator.

/s/    Marc W. Brown
Justice

Panel consists of Justices Busby, Brown, and Wise.

19